UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

THOMAS CARTER,                          )
                                        )
          Plaintiff,                    )
                                        )
     v.                                 )        Case No. 4:20-CV-00670-AGF
                                        )
ZUKHRIDDIN KHAYRULLAEV, et. al.,        )
                                        )
          Defendants.                   )

## MEMORANDUM AND ORDER

Plaintiff Thomas Carter brings this case on behalf of himself, individually, and on behalf of the estate of Margaret Carter, who died when a commercial motor vehicle collided with her car on September 17, 2017.  (Doc. No. 1, Exh. 3).  General Electric ("GE") arranged for Defendant Landstar Ranger, Inc. ("Landstar") to transport a bake oven.   Landstar hired Defendant American Power Transportation ("APT") to carry the commercial load.  APT contracted with Defendant MGI Express, LLC ("MGI") to lease one of MGI's trucks to haul the load.  (Doc. No. 81 at 2).  MGI then hired Defendant Zukriddin Khayrullaev to drive the commercial vehicle.  *Id.* at 1.  On the day of the collision, Khayrullaev was driving westbound on Interstate 44 when he lost control of the tractor trailer of MGI's vehicle, entered the eastbound lane of the interstate, and struck Ms. Carter's vehicle.  *Id*.

On June 15, 2022, Landstar filed a motion to exclude the expert testimony of Plaintiff's witnesses Thomas Corsi and William Hampton.  These matters are now before the Court.  For the reasons outlined below, the Court will grant in part and deny in part

both motions.

## BACKGROUND

### I.      Thomas Corsi

Dr. Thomas Corsi is a Professor of Logistics and Transportation at the University of Maryland, Robert H. Smith School of Business, where he has taught since 1976.  (Doc. No. 83 at 3).  In this role, Dr. Corsi and the faculty in his group received recognition in the Transportation Journal as the most prolific faculty group in the field of transportation and logistics based on their published research.  (Doc. No. 70, Exh. Q at 1).  Dr. Corsi has also served as a consultant to the Department of Transportation, Federal Motor Carrier Safety Administration ("FMCSA"), and its predecessor agencies in the area of motor carrier safety since 1980.  (Doc. No. 83 at 3).  In this capacity, Dr. Corsi evaluates and rates the safety performance of motor carriers, considers the impact of government safety regulations and inspection programs on safety, and analyzes the impact of carrier safety management programs and policies on safety.  *Id*.  Dr. Corsi has specifically advised on areas of safety management including driver selection, training and supervision, and vehicle maintenance and operations.  (Doc. No. 70, Exh. Q at 3).  Plaintiff intends to introduce Dr. Corsi to the jury as an expert in the roles that carriers, brokers, and shippers play in the movement of freight across the United States, as well as in the policies and procedures those actors employ in the industry.  (Doc. No. 83 at 3-4).

In order to arrive at his opinions, Dr. Corsi examined the police reports associated with the accident at issue in this case, as well as the Missouri State Highway Patrol's Reconstruction Report.  (Doc. No. 70-6, Exh. Q at 4-5).  Dr. Corsi also examined

2

business records between the parties, including an October 21, 2014 lease agreement; the

bill of lading for Khayrullaev's delivery; FMCSA reports on MGI and APT; Ohio

business records for MGI and APT; Landstar, APT, and MGI's Behavior Analysis Safety

Improvement Categories ("BASIC") scores through a vendor referred to as "SAFER";

the transportation brokerage agreements between Landstar and APT and MGI; and the

master transportation agreement between GE and Landstar.  *Id*. at 14.  Finally, Dr. Corsi

considered certain litigation materials, including Plaintiff's motion to compel, *see* Doc.

No. 30; the petition; and the depositions of Landstar's Vice President of Capacity and

Development, Scott Ray; the owner of APT, Ilimdar Abbasov; Landstar's Vice President

for Heavy Specialized and Intermodal, Rusty Cody; and Landstar's Executive Vice

President for Capacity Development, Rocco Davanzo.  (Doc. No. 70-6, Exh. Q at 14).

     Dr. Corsi arrives at four main opinions, all of which Landstar seeks to exclude: (i)

Landstar is the designated and legally bound motor carrier; (ii) Landstar's 2013

subcontract with APT violated its master service agreement provisions and its carrier

qualification policy; (iii) APT served as an agent of Landstar, rather than as an

independent contractor; and (iv) Landstar's retention of APT was directly in conflict with

its own policies and procedures for the retention of safe carriers.[1]  (Doc. No. 70-6, Exh.

Q).  In arriving at the first opinion, Dr. Corsi examined the master services agreement

---

[1]    It appears that, at times, Dr. Corsi conflates Landstar Transportation Logistics, Inc.
("Landstar Transportation"), which is not a party to this suit, with Landstar.  Landstar
Transportation signed the master services agreement with GE on behalf of Landstar.
(Doc. No. 71 at 3).  Landstar is the entity that contracted with APT.  (Doc. No. 67-8,
Exh. G).

between GE and Landstar Transportation.  He noted that the agreement identified Landstar as the "carrier" and GE as the "shipper," and that it further defined Landstar as a "motor carrier of property properly registered with the [FMCSA]…engaged in the business of transporting property by motor vehicle in interstate, intrastate, and foreign commerce."  *Id*. at 6-7.  As a carrier, Landstar bore the responsibility to subcontract "qualified, contracted motor carriers."  *Id*. at 7.  Such subcontractors are only those which "maintain operating authority from the FMCSA, or, if unrated, acceptable CSA 2010 BASIC scores."  *Id*.  Similarly, such contractors must "maintain a 'Satisfactory' safety rating from the FMCSA."  *Id*.  According to Dr. Corsi, the bill of lading for this shipment also identified Landstar as the service provider, or carrier.  *Id.* at 8.  Dr. Corsi also evaluated the FMCSA Regulations, which define a motor carrier as those who "arrange the transportation of shipments which they are authorized to transport and which they have accepted and legally bound themselves to transport."  *Id*.  Based on these facts and Dr. Corsi's reading of the master services agreement, he opined that Landstar was the designated and legally bound motor carrier during this incident.  *Id*.

Dr. Corsi applied a similar analysis of the master services agreement with GE in order to arrive at his second opinion.  (Doc. No. 70-6, Exh. Q at 8).  The master services agreement required Landstar to obtain GE's permission prior to entering into a subcontracting agreement with another carrier.  *Id*.  It also required the carrier to have acceptable BASIC scores.  *Id*. at 9.  However, Dr. Corsi noted that there is no record of any written permission granting Landstar the authority to enter into a subcontracting agreement with another carrier, and that APT lacked acceptable BASIC scores.  *Id*.

4

In order to reach his third opinion, Dr. Corsi conducted a contractual analysis of the contract between APT and Landstar.  (Doc. No. 70-6, Exh. Q at 10-11).  Dr. Corsi notes that the contract between these two defendants explicitly identifies APT as an independent contractor.  *Id*. at 11.  However, he also notes that the Landstar Load Confirmation for the shipment at issue in this case provides specific directions to APT's driver, including: (i) instructions to call for site directions from a Landstar dispatcher; (ii) instructions on load tarping, with a penalty for violations; (iii) requirements for a driver's clothing; (v) directions to contact Landstar dispatch over the weekends as a check call; and (vi) requirements that the driver be responsible for on-time pick-ups and deliveries. *Id*.  The agreement further mandates that the drivers use Landstar's tracking application during the delivery.  *Id*.  In Dr. Corsi's opinion, these elements of control suffice to make APT an agent for Landstar, rather than its independent contractor.

For his final opinion, Dr. Corsi examined APT's BASIC scores from 2015 through 2017.  (Doc. No. 70-6, Exh. Q at 12).  Dr. Corsi noted that APT's BASIC scores fell below Landstar's stated requirements in its Carrier Qualification Guidelines.  *Id*.  He noted that APT's BASIC score in the category of unsafe driving was high enough to result in APT's automatic disqualification, but that no one at Landstar examined this data when working with APT.  *Id*. at 13.

## II.   <u>William Hampton</u>

William Hampton is a motor vehicle accident reconstruction expert who is certified for accident reconstruction by the Missouri State Highway Patrol.  (Doc. No. 72, Exh. S).  Mr. Hampton claims forty-five years of experience in analysis of safety and

compliance with Department of Transportation regulations.  *Id*. at 3.  In 1991, Mr.
Hampton worked as the Director of Safety for a nationwide commercial motor carrier.
He specialized in Department of Transportation compliance, immediate response accident
investigation, and insurance claims management.  *Id*.  He has also assisted members of
the transportation and shipping industry with issues pertaining to brokerage.  *Id*. at 4.

Mr. Hampton offers eleven opinions, which the parties have organized into three
"groups": (i) Group 1: Landstar is a motor carrier which exercised control over APT
during the transportation at issue (opinions 1, 9, and 10); (ii) Group 2: Landstar violated
its agreement with GE (opinions 2, 3, and 4); and (iii) Group 3: Landstar failed to follow
either its own or industry standards (opinions 5, 6, 7, 8, and 11).  (Doc. No. 73).  Mr.
Hampton also arrives at ten conclusions regarding liability for the accident at issue;
however, Landstar does not attack these opinions in the present motion.

In his report, Mr. Hampton first outlines the evidence he reviewed before listing
his opinions and conclusions.  (Doc. No. 72, Exh. R).  Mr. Hampton considered the
master services agreement between GE and Landstar, and highlighted a provision of the
contract stating that the "Carrier may subcontract to qualified, contracted motor
carriers[.]"  *Id*. at 5.  He also analyzed the bill of lading for the shipment at issue in this
case, and noted that Landstar is listed as the "Service Provider."  *Id*. at 8.  Mr. Hampton
uses this analysis and the interpretation of the master services agreement in order to
determine whether Landstar acted as a motor carrier legally responsible for the shipment
in this case.  *Id*. at 10.

Mr. Hampton further analyzed Landstar's internal policies, which required

6

considering APT's safety performance history as a motor carrier prior to subcontracting with Landstar.  (Doc. No. 72, Exh. R at 9).  He also considered Mr. Ray's deposition testimony in order to determine how Landstar selected APT, and whether Landstar employees ever reviewed APT's BASIC scores prior to selecting the company.  *Id*. Overall, Mr. Hampton states that Landstar violated its master services agreement with GE and its own internal policies when it selected APT as a subcontractor.  *Id*.

Finally, Mr. Hampton considered the master services agreement with GE, the regulations to the FMCSA, and Landstar's historical relationship with APT in order to determine whether Landstar exercised control over its subcontractor.  (Doc. No. 72, Exh. R at 11-12).  Mr. Hampton noted that when APT lost cargo, it was required to repay Landstar in order to obtain its approved carrier status.  *Id*. at 12.  Furthermore, when APT failed to pick up a scheduled load, Landstar managed the customer's concerns, rather than APT.  *Id*.

## ARGUMENTS OF THE PARTIES

### I.     Thomas Corsi

Landstar asserts that the Court must exclude all four of Dr. Corsi's opinions. (Doc. No. 71).  Landstar does not question Dr. Corsi's qualifications as an expert but rather challenges the opinions he offers.  Landstar argues that Dr. Corsi's first opinion is an impermissible legal conclusion.  *Id*. at 3.  Dr. Corsi determined that Landstar was a "motor carrier" rather than a "broker" by interpreting the language of Landstar's master services agreement with GE and the bill of lading used in the delivery at issue in this case.  *Id*.  Plaintiff contends that Dr. Corsi's analysis instead applies industry

interpretations of the terms in order to determine how those terms are used in the master services agreement.  (Doc. No. 83 at 9).

Landstar argues that Dr. Corsi's second opinion is insufficient because it is irrelevant.  (Doc. No. 71 at 5).  However, Plaintiff points out that the opinion that Landstar's subcontract with APT violated the master services provision is relevant to the issue of whether Landstar negligently selected APT as a subcontractor.  (Doc. No. 83 at 8).

Landstar's third assertion is that Dr. Corsi's opinion that APT served as Landstar's agent must be excluded because the opinion contains no more than a mere recitation of the Landstar Load Confirmation.  (Doc. No. 71 at 7).  The opinion would therefore substitute Dr. Corsi's judgment for that of the jury on the issue of whether an agency relationship existed between Landstar and APT.  *Id*. at 10.  Plaintiff responds that Landstar's Load Confirmation does not explicitly state the existence of an agency relationship but instead details the factual basis on which a jury might find that such a relationship exists.  (Doc. No. 83 at 9).

Finally, Landstar claims that Dr. Corsi failed to fully consider relevant evidence when arriving at his fourth opinion, that Landstar violated its own policies by retaining APT.  (Doc. No. 71 at 12).  Specifically, Landstar notes that Dr. Corsi could not explain what caused APT's BASIC scores to fluctuate below the threshold Landstar had outlined. *Id*.  Landstar also argues that the opinion merely recites the record and makes factual findings regarding the BASIC scores and whether anyone at Landstar reviewed those scores.  *Id*. at 13.  In response, Plaintiff explains that Dr. Corsi opines that the BASIC

8

scores are correlated with unsafe driving, and that the violation of Landstar's own policies is relevant in this case.  (Doc. 83 at 12).

## II.  <u>William Hampton</u>

 Landstar argues that Mr. Hampton predicated his first grouping of opinions on a misreading of the evidence before him.  (Doc. No. 73 at 4).  Specifically, Mr. Hampton misread the Landstar Loading Confirmation as listing Ilkholm Abbasov as the driver of the vehicle at issue in this case, rather than Khayrullaev.  *Id*.  Mr. Abbasov is instead the owner of APT.  *Id*.  Landstar also asserts that Mr. Hampton misinterprets the master services agreement between GE and Landstar, and that he fails to consider facts essential to the determination of whether APT is an agent of Landstar.  *Id*. at 3-4.  Plaintiff responds that Mr. Hampton sufficiently considered indicators of an agency relationship when he examined how Landstar controlled APT's response to customers after failing to pick up a load. (Doc. No. 84 at 6).

Landstar claims that Mr. Hampton's second group of opinions are impermissible legal conclusions regarding the interpretation of a contract, and that offering this testimony would substitute Mr. Hampton's judgment for that of the jury.  (Doc. No. 73 at 5).  Landstar also states that Mr. Hampton insufficiently explains how he arrived at the conclusion that Landstar did not inform GE of its decision to subcontract with APT.  *Id*. at 6.  In response, Plaintiff explains that Mr. Hampton merely used the master services agreement to better understand which party is considered a "carrier."  (Doc. No. 84 at 7).

Landstar's final argument asserts that Mr. Hampton's last grouping of opinions is inadmissible because Mr. Hampton relied on factual misunderstandings of the record in

order to arrive at opinions which are ultimately irrelevant to the tort underlying this case. (Doc. No. 73 at 8).  Specifically, Landstar contends that any violation of its agreement with GE is irrelevant to this tort case, and that Mr. Hampton misrepresented how Landstar would obtain safety data from its vendor, SaferWatch.  *Id*. at 8-9.  Plaintiff claims in response that Landstar had a long history of ignoring when APT's BASIC scores were no longer sufficient for carrier status under Landstar's own policies.  (Doc. No. 84 at 9).

## **DISCUSSION**

The admission of expert testimony in federal court is governed by Federal Rule of Evidence 702.  *Wagner v. Hesston Corp*., 450 F.3d 756, 758 (8th Cir. 2006).  Rule 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.  The rule was amended in 2000 in response to *Daubert v. Merrell Dow Pharms., Inc*., 509 U.S. 579 (1993), which charged trial judges with a "gatekeeping" role to exclude unhelpful and unreliable expert testimony.

Factors relevant to the reliability and relevancy determinations include: "(1) whether the theory or technique can be or has been tested; (2) whether the theory or

technique has been subjected to peer review or publication; (3) whether the theory or

technique has a known or potential error rate and standards controlling the technique's

operation; and (4) whether the theory or technique is generally accepted in the scientific

community." *Russell v. Whirlpool Corp.*, 702 F.3d 450, 456 (8th Cir. 2012) (citations

omitted).  Additional factors include "whether the expertise was developed for litigation

or naturally flowed from the expert's research; whether the proposed expert ruled out

other alternative explanations; and whether the proposed expert sufficiently connected

the proposed testimony with the facts of the case." *Lauzon v. Senco Prods., Inc.*, 270

F.3d 681, 686 (8th Cir. 2001).

   "[T]he *Daubert* reliability factors should only be relied upon to the extent that

they are relevant and the district court must customize its inquiry to fit the facts of each

particular case." *Shuck v. CNH Am., LLC*, 498 F.3d 868, 874 (8th Cir. 2007); *see also

Unrein v. Timesavers, Inc.*, 394 F.3d 1008, 1011 (8th Cir. 2005) (stating that the

"evidentiary inquiry is meant to be flexible and fact specific, and a court should use,

adapt, or reject *Daubert* factors as the particular case demands").  There is no single

requirement for admissibility as long as the proffer indicates that the expert evidence is

reliable and relevant.  *Unrein*, 394 F.3d at 1011.  The question is whether the expert's

opinion is sufficiently grounded to be helpful to the jury.  *Id.* at 1012.

   Although the proponent of the expert testimony must prove its admissibility by a

preponderance of the evidence, *Daubert*, 509 U.S. at 592, Rule 702 "is one of

admissibility rather than exclusion."  *Shuck*, 498 F.3d at 874.  "Vigorous cross-

examination, presentation of contrary evidence, and careful instruction on the burden of

proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Olson v. Ford Motor Co.*, 481 F.3d 619, 626 (8th Cir. 2007).  Proposed expert testimony "must be supported by appropriate validation - i.e., good grounds, based on what is known"; expert "knowledge connotes more than subjective belief or unsupported speculation." *Daubert*, 509 U.S. at 590, 599 (citation omitted).  But any "doubts regarding whether an expert's testimony will be useful should generally be resolved in favor of admissibility." *Clark v. Heidrick*, 150 F.3d 912, 915 (8th Cir. 1998).

I.    **Thomas Corsi**

**Opinion 1: Landstar is the Designated and Legally Bound Motor Carrier**

The parties dispute whether Landstar is a "broker" or a "motor carrier" based on the facts of this case.  Different regulations outline the standards of care by which a broker or a motor carrier must abide.  (Doc. No. 71 at 2).  While a "broker" acts as a principal or agent and sells or negotiates for the transportation of goods by another motor carrier for compensation, a "motor carrier" is authorized and legally bound to transport the shipments it has accepted.  *See* 49 U.S.C. § 13102; 49 C.F.R. § 371.2.  Dr. Corsi opines that Landstar operated as a motor carrier for GE per the terms of the companies' master services agreement.  (Doc. No. 70-6, Exh. Q at 6-7).  His ultimate conclusion is that Landstar is "legally responsible" for the load at issue in this case.  *See* (Doc. No. 71 at 4).  Landstar argues that this opinion is an inadmissible legal conclusion predicated on the analysis of a contract.

Expert testimony on legal matters is generally not admissible.  *See Southern Pine*

12

*Helicopters, Inc. v. Phoenix Aviation Managers, Inc.*, 320 F.3d 838, 841 (8th Cir. 2003).  The master services agreement stipulates that it shall be construed under New York law.  (Doc. No. 87, Exh. B at 6).  Under New York Law, the parties may introduce to the jury relevant extrinsic evidence regarding the parties' actual intent when drafting a contract only if that contract's terms are ambiguous.  *See Scholastic, Inc. v. Harris*, 259 F.3d 73, 83 (2d Cir. 2001) (citing *Seiden Assocs. v. ANC Holdings, Inc.*, 959 F.2d 425, 428 (1992); *Alexander & Alexander Servs. v. These Certain Underwriters at Lloyd's, London*, 136 F.3d 82, 86 (1998)).  Such admissible extrinsic evidence includes expert testimony regarding the term at issue's meaning based on "known customs or usages in a particular industry." *M & G Polymers USA, LLC v. Tackett*, 574 U.S. 427, 429 (2015).

New York law provides that the question of whether a contract's language is clear or ambiguous is one of law to be decided by the Court.  *See Compagnie Financiere De Cic Et De L'UNION Europeenne, Management Invest. Funding Ltd. v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 232 F.3d 153, 157-158 (2d Cir. 2000).  However, if the contract's language is ambiguous, the interpretation of that language becomes a question of fact to be resolved by the factfinder.  *Id*. (quoting *3Com Corp. v. Banco do Brasil, S.A.*, 171 F.3d 739, 746-747 (2d Cir. 1999)).  Thus, if the provisions of the master services agreement outlining whether Landstar is a "motor services carrier" or a "broker" are ambiguous, then the parties may introduce expert testimony explaining the terms as used in the industry.  If Dr. Corsi's opinions pertain to the meaning of the terms as used in the industry, his testimony would then be admissible.

13

In contrast, if the terms are not ambiguous, or if Dr. Corsi's testimony does not pertain to the meaning of the terms as used in the industry, then Dr. Corsi's testimony is inadmissible.

Contract language is ambiguous if it is "capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement." *Compagnie Financiere*, 232 F.3d at 157-158 (quoting *Sayers v. Rochester Tel. Corp. Supplemental Mgmt. Pension Plan*, 7 F.3d 1091, 1094 (2d Cir. 1993)).  When a contract's terms carry one meaning in one portion of the contract, and another meaning in a different portion of the contract, the term is considered ambiguous.  *See Scholastic, Inc. v. Harris*, 359 F.3d 73, 82-83 (2d. Cir. 2001).  Landstar admits that the master services contract refers to it as a "Carrier." (Doc. No. 70 at 3).  The master services agreement further outlines that Landstar "represents and warrants that it is a motor carrier of property[.]"  (Doc. No. 87, Ex. B at 3).  However, Landstar also points out that its role as carrier includes "transportation (air, ground), logistics, insurance, and warehousing."  *Id*.  According to Landstar, the term "logistics" incorporates the services Landstar would provide as a broker, rather than as a carrier.  (Doc. No. 70 at 3).  Furthermore, Landstar notes that the master services agreement allowed it to subcontract for transportation of its shipments, giving Landstar the role of a broker, rather than a motor carrier.  *Id*.

Landstar's explanation of its role introduces ambiguity into the meaning of the term "Carrier" in the master services agreement: though the agreement refers to Landstar as a "motor carrier of property," it gives it the authority to arrange for

14

transportation through other motor carriers, giving it the duties of a "broker."  The jury

must determine the meaning of this ambiguity and may turn to expert testimony

regarding standard industry use of the terms in order to better understand the contract.

However, it is less clear whether Dr. Corsi's opinion is predicated on industry usage of

these terms.

       Courts carefully distinguish between the application of the law to the facts of a

case, which infringes on the "special legal knowledge" of the Court, and an explanation

of "mere regulatory background," which is acceptable expert testimony.  *Guy v. Ford*

*Storage Moving Co.*, No. 4:18-cv-216-JAJ-RAW, 2020 WL 12309717, at *3 (S.D.

Iowa, Oct. 28, 2020).  When an expert's interpretation of motor carrier status is

predicated on the interpretation of statutes without further factual investigation, the

Court must exclude that testimony.  *See Scott v. Milosevic*, No. C17-4004-LTS (lead

case), No. C17-4022-LTS, 2019 WL 8325150, at *7 (N.D. Iowa, Feb. 14, 2019)

(internal citations omitted).  Dr. Corsi employs the FSMCA in order to describe the

actions a motor carrier is required to undertake.  He also examines the bill of lading in

order to determine whether Landstar operated in that manner, as the industry would

expect of a motor carrier.  Though Landstar takes issue with Dr. Corsi's reading of the

bill of lading, this contention is best addressed on cross-examination, rather than by

excluding Dr. Corsi's testimony.  *See Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S.

137, 157 (1999).  The Court finds that Dr. Corsi's opinion is sufficiently predicated on

evidence of actual usage of the terms in the industry to distinguish it from a mere

application of the FMCSA to the facts.  To the extent that Dr. Corsi's testimony

pertains to the industry usage of the term "motor carrier" and the term "broker," his testimony may assist the trier of fact and is admissible.

### Opinion 2: Landstar's 2013 Subcontract with APT Violated the Master Services Agreement and Landstar's Carrier Qualifications Policy

Landstar first argues that the Court should exclude Dr. Corsi's second opinion because it is not relevant to the underlying causes of action Plaintiff pursues against it. Under Missouri law, "a breach of contract itself without an underlying tort does not create an action in tort." *Sakabu v. Regency Const. Co., Inc.*, 392 S.W.3d 494, 497 (Mo. App. E.D. 2012). Dr. Corsi makes three predicative findings supporting his opinion that Landstar's subcontract with APT violated the master services agreement: (i) Landstar failed to obtain GE's permission prior to subcontracting; (ii) GE required using carriers with acceptable BASIC scores, and APT did not meet this qualification; and (iii) as of April 1, 2017, the master services agreement required Landstar use carriers only with a "satisfactory" rating, which APT did not have. (Doc. No. 70, Exh. Q).

Dr. Corsi's opinion that Landstar violated the master services agreement by failing to obtain GE's permission prior to subcontracting with APT, standing alone, is not relevant. Whether or not Landstar obtained GE's permission to subcontract does not shed light on APT's qualifications. Furthermore, while an expert may testify as to how an industry has developed certain standards and policies in order to comply with applicable regulations, that expert may not describe whether or not facts applicable to the compliance with regulations exist in the record. *See Guy*, 2020 WL 12309717, at

16

\*3-4.  "Reading documents and deciding on the existence of facts is completely within the knowledge and experience of the jury."  *Id*. at \*4.  Dr. Corsi arrives at his conclusion that Landstar failed to obtain permission from GE by noting the record he reviewed contained no evidence of written permission.  (Doc. No. 71 at 5).  The jury is capable of making this determination.  Dr. Corsi's review of the record therefore exceeds the boundaries of permissible expert testimony and the Court will exclude it.

The Court also has problems perceiving the relevance of the opinion that Landstar's 2013 subcontract with APT violated the master services agreement when it was entered into in 2013.  Dr. Corsi admits in his deposition that a breach could only occur if APT transported a load in 2013, and he had no evidence of such an occurrence.  As such, this opinion has no basis in the record and will be excluded.

The same cannot be said with respect to whether Landstar violated its own Carrier Qualification Policy, however, which is relevant.  Moreover, Dr. Corsi's testimony with respect to the BASIC scores and what was required under the Policy may be helpful to the jury.  Dr. Corsi may also reference and explain the requirements in the master services agreement, to the extent that they are reflective of and consistent with industry standards.

Dr. Corsi's third predicate opinion, that APT was an unrated carrier, and did not "maintain a Satisfactory safety rating from the DOT(FMSCA)" is likewise relevant, has a sufficient factual basis, and may be helpful to the jury.  This testimony pertains to an April, 2017 amendment of the master services agreement.  The parties apparently disagree as to whether this amendment supplanted or supplemented the terms of Section

17

1(g), which permits the use of unrated carriers with acceptable BASIC scores.  Dr.

Corsi has not offered a basis for any opinion that the amendment supplanted the prior

terms, and it is an issue for the jury.  As such, while Dr. Corsi will be permitted to

testify regarding a "satisfactory" safety rating, he will not be permitted to opine on the

effect of the amendment in this regard.  To the extent that Landstar believes APT had

an acceptable BASIC score at the time of these events, it may cross-examine Dr. Corsi

on this basis.

### Opinion 3: APT Served as an Agent of Landstar, Rather than as its Independent Contractor

Landstar claims that Dr. Corsi's third opinion must be excluded because it

considers only the Landstar Load Confirmation, which outlines the duties Landstar

expects its subcontractor to undertake, without considering whether the document is an

accurate reflection of Landstar's intent.  (Doc. No. 71 at 8).  Specifically, Landstar

asserts that permitting Dr. Corsi to testify that the document demonstrates Landstar's

degree of control over APT will substitute his judgment for the jury's judgment.  *Id*. at

10.  The defendant in *Riley v. A.K. Logistics* made a similar argument: that Dr. Corsi, as

an expert witness in that case, would "essentially" tell the jury what conclusion to reach

on the issue of whether a contractor exercised sufficient control over its subcontractor

to establish an agency relationship.  Case No. 1:15-cv-00069-JAR, 2017 WL 2501138,

at *14 (E.D. Mo. Jun. 9, 2017).  However, the Court instead found that Dr. Corsi's

testimony would assist the jury in determining which facts were indicative of control,

rather than instructing them that the requisite control existed.  *Id*.  Likewise, here, Dr.

Corsi's review of the Landstar Load Confirmation may assist the jury in determining the operative facts for establishing control over a subcontractor.  To the extent that Landstar doubts whether Dr. Corsi has a sufficient basis for that opinion, it may pursue those doubts on cross-examination.  Similarly, as in *Riley*, "[i]f the parties have any doubt regarding whether a line of questioning will improperly invade the province of the jury, they shall raise the issue with the Court at the final pre-trial conference as part of a motion in limine, or consult with the Court at a sidebar."  2017 WL 2501138, at *14.  However, Dr. Corsi will be permitted only to testify regarding facts indicative of the control factor.  He will not be permitted to testify that APT was an agent and not an independent contractor.

### Opinion 4: Landstar's Retention of APT is Directly in Conflict with its Own Policies and Procedures for Retention of Safe Carriers

Landstar contends that the Court must exclude Dr. Corsi's fourth opinion because it contains a mere "recitation of fact" that APT's BASIC scores fell below the requirements of Landstar's policies for subcontractors.  (Doc. No. 71 at 12).  However, Dr. Corsi's examination of APT's BASIC scores includes more than a mere review and recitation of the record; Dr. Corsi uses the BASIC scores to determine whether Landstar itself would consider APT a competent carrier.  The question of whether Landstar followed its own policies is pertinent to determining whether it negligently selected APT as a subcontractor.  *See Pugh v. Fang JunQing*, Case No. 4:16-CV-1881 RLW, 2018 WL 1406589, at *5 (E.D. Mo. Mar. 20, 2018) (citing Missouri law).  Dr. Corsi's testimony may assist the jury with making this determination.  Though Landstar asserts

19

that Dr. Corsi failed to consider why or how APT's BASIC scores fluctuated, this failure is insufficient for excluding his testimony; instead, Landstar may cross-examine Dr. Corsi on this issue.

Landstar additionally asserts that Dr. Corsi's statement that "the record shows that there is nothing to indicate that anyone at [Landstar] reviewed any BASIC scores for [APT] until a week prior to Mr. Ray's post-crash deposition" is a factual contention that would mislead the jury. The Court agrees. This testimony merely recites the record and makes a factual finding, which impedes on the jury's prerogative. Accordingly, the Court will exclude this testimony.

## II.    **William Hampton**

### Group 1: Landstar is a Motor Carrier which Exercised Control over APT During the Transportation at Issue

Mr. Hampton provides three opinions comprising what the parties refer to as "Group 1:" (i) Landstar is the motor carrier controlling the APT vehicle involved in the accident at issue, (ii) Landstar controlled APT in all activities of its movement of freight, and (iii) Landstar controlled APT in all aspects of its settlements of cargo losses. (Doc. No. 72, Exh. R). Landstar argues that these opinions lack factual support. (Doc. No. 73 at 4). Mr. Hampton grounds his opinion that Landstar is a "motor carrier" in his analysis of Landstar's agreement with GE. He also relies on this reading of the Landstar Load Confirmation when determining whether Landstar exercised control over APT. *Id*. However, Landstar asserts that Mr. Hampton's analyses contain factual flaws, including a misunderstanding of the driver listed on the Landstar Load Confirmation. Landstar's

disagreement with Mr. Hampton's understanding of the facts in this case does not render Mr. Hampton's opinions lacking factual support.  This disagreement is best explored on through cross-examination; it does not provide a sufficient basis for excluding Mr. Hampton's testimony.

**Group 2: Landstar Violated its Agreement with GE**

Mr. Hampton provides three opinions in "Group 2": (i) Landstar was the only motor carrier operating under its master services agreement with GE, (ii) Landstar violated the master services agreement by failing to notify GE that it had entered a business venture with APT, and (iii) Landstar violated the "Statement of Work" portion of the master services agreement with GE, which required Landstar provide DOT Safe Stat Scores to GE on a monthly basis.  (Doc. No. 73 at 5; Doc. No. 72, Exh. R at 10). Much like Dr. Corsi's testimony, the Court finds that Mr. Hampton's testimony regarding whether Landstar was a motor carrier under the provisions of its master services agreement with GE will help the jury interpret the meaning of an ambiguous phrase in a contract important to this case.  For the reasons stated with respect to Dr. Corsi, the Court likewise finds that Mr. Hampton's opinions that Landstar employees did not notify GE that it had entered into a subcontract with APT or provide Department of Transportation Safe Stat scores to GE constitute impermissible recitations of factual findings, which will be excluded.

**Group 3: Landstar Failed to Follow Either its Own or Industry Standards**

The final grouping of Mr. Hampton's opinions include the conclusions that: (i) Landstar failed to follow industry standards, its own policies, and the requirements of the master services agreement when subcontracting with APT, thus creating an unsafe hazard to the public; (ii) Landstar failed to ensure it operated within the safety standards of a motor carrier, while APT operated as an unsafe carrier; (iii) Landstar had policies in place to ensure it conducted business with a safe company, but it disregarded its own policies; and (iv) Landstar's disregard for public safety contributed to the causation of the crash at issue.  (Doc. No. 73 at 6-7).  Mr. Hampton bases these opinions on his review of APT's BASIC scores while APT worked with Landstar.  (Doc. No. 67-5, Exh. D at 74:7-10).

Landstar first asserts that Mr. Hampton lacks training in motor carrier selection of brokers, making him unqualified to opine as to industry standards for motor carrier safety.  (Doc. No. 73 at 7).  However, Mr. Hampton does have experience advising brokers in the transportation industry.  (Doc. No. 72, Exh. S).  He also has experience advising companies in the transportation and shipping industry as to compliance with Department of Transportation safety regulations, giving him the requisite experience to testify as an expert on this issue.  *Id.*

Next, Landstar contends that Mr. Hampton's conclusions regarding whether it violated its agreement with GE must be excluded because the violation of a contract does not necessarily entail a tort.  (Doc. No. 72 at 8).  Unlike Dr. Corsi's examination of the

22

master services agreement's requirement that Landstar only subcontract with companies with sufficient BASIC scores, Mr. Hampton predicates his opinion that Landstar failed to follow the requirements of the master services agreement on its failure to notify GE of its subcontracting or to send its Safe Stat scores to GE.  (Doc. No. 73 at 7-8).  The Court will exclude this portion of Mr. Hampton's fifth opinion as an impermissible factual finding by an expert witness that will not assist the jury.

Landstar's final argument against the admissibility of Mr. Hampton's opinions is that Mr. Hampton misstates the factual record when he claims that Landstar failed to monitor motor carriers' safety performance through the vendor SaferWatch from 2013 through 2017, violating Landstar's policies and contributing to the safety hazard of employing APT.  (Doc. No. 73 at 9).  Instead, Landstar points out that Mr. Ray testified that SaferWatch would automatically bring carriers with BASIC scores exceeding certain levels into unapproved status as of May 2017.  *Id*.  As with Landstar's other factual disagreements with Mr. Hampton and Dr. Corsi, this distinction is best reserved for cross-examination, and it does not support excluding Mr. Hampton's testimony.

Accordingly,

**IT IS HEREBY ORDERED** that Landstar's motion to exclude the report and testimony of Thomas Corsi is **GRANTED in part and DENIED in part.**  (Doc. No. 70). The Court will exclude Dr. Corsi's testimony regarding Landstar's failure to obtain GE's permission to subcontract with APT and his testimony regarding whether anyone at Landstar reviewed APT's BASIC scores. It will also exclude Dr. Corsi's testimony regarding whether Landstar's 2013 subcontract with APT violated the master services

agreement when it was entered into and whether the April, 2017 amendment supplanted the prior terms of the master services agreement.  Lastly, the Court will permit Dr. Corsi to testify only to the degree of control Landstar exercised over APT.  It will not permit Dr. Corsi to testify as to whether APT was Landstar's agent or independent contractor.

**IT IS FURTHER ORDERED** that Landstar's motion to exclude the report and testimony of William Hampton is **GRANTED in part and DENIED in part**.  (Doc. No. 72).  The Court will exclude Mr. Hampton's testimony regarding Landstar's failure to obtain GE's permission to subcontract with APT and his testimony regarding Landstar's failure to provide GE with Department of Transportation Safe Stat scores.

AUDREY G. FLEISSIG
UNITED STATES DISTRICT JUDGE

Dated this 17th day of October, 2022.