IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI

| | |
|---|---|
| THOMAS CARTER, Individually and on Behalf of The Estate of Margaret Carter,<br><br>Plaintiffs,<br><br>vs.<br><br>ZUKHRIDDIN KHAYRULLAEV, MGI EXPRESS, LLC, AMERICAN POWER TRANSPORTATION And LANDSTAR RANGER, INC.,<br><br>Defendants. | Case No.   4:20-cv-00670-AGF<br><br>JURY TRIAL DEMANDED |

**PLAINTIFF'S PRE-TRIAL BRIEF**

COMES NOW Plaintiff, for his Pre-Trial Brief, and state:

**I.    INTRODUCTION**

On September 17, 2017, Margaret Carter was killed when a commercial motor vehicle driven by Zukhridden Khayrullaev struck her vehicle. Mr. Khayrullaev was driving westbound on Interstate 44 when he lost control of the tractor trailer and entered the eastbound lane of the interstate, striking Ms. Carter's vehicle, causing both vehicles to travel down an embankment.

Defendant American Power Transportation ("APT) was hired to transport the load Mr. Khayrullaev was carrying for Defendant Landstar Ranger, Inc ("Landstar").[1][2] The causes of action that Plaintiff has alleged and are at issue at trial in this case are summarized in the table below:

---

[1] APT was hired through a series of written agreements between GE (shipper), Landstar (carrier), and APT (carrier), including Landstar's contract with GE (Exhibit 8 and 9); Landstar and APT's Brokerage Agreement (Exhibit G), Landstar's Load Confirmation (Exhibit H), and GE's Bill of Lading (Exhibit I and J).

[2] All Exhibits referenced herein are the same Exhibits from the parties Summary Judgment Briefing.

| Defendant: | Cause(s) of Action: |
|---|---|
| **ZUKHRIDDIN KHAYRULLAEV** (Driver of tractor trailer) | **(1) Wrongful death** – Negligent operation of vehicle |
| **LANDSTAR RANGER, INC.** (Carrier for load in question, hired APT to transport load) | **(1) Wrongful death/Agency** – Negligent operation of vehicle through agency<br><br>**(2) Negligent Entrustment** of Defendants APT, and Khayrullaev |
| **AMERICAN POWER TRANSPORTATION** (Employer of at fault driver) | **(1) Wrongful death/Agency** – Negligent operation of vehicle through agency |

For purposes of this Trial Brief, Plaintiffs will discuss some of the legal principles that they think will be most relevant and disputed at trial. Plaintiffs will first discuss the law regarding the agency claim against Landstar because there will be significant evidence and testimony presented on the issue. Plaintiff will not discuss the agency theory against APT because it is expected that APT will not dispute that its driver was an agent of APT. If that changes, Plaintiff will of course present evidence on that topic. Plaintiffs will also address Landstar's negligent entrustment of Defendant APT and Khayrullaev as we believe there will be an abundance of evidence on the issue at trial. Lastly, Plaintiffs will discuss "pre-impact terror" damages that they plan to present to the jury at trial in this matter.

## II.     DEFENDANT APT AND KHAYRULLAEV WERE AGENTS OF LANDSTAR

Missouri courts routinely consider the factors set forth in § 220(2) of the Restatement (Second) of Agency when determining whether a person or entity acting for another is an agent

2

for purposes of *respondeat* superior liability. *Id*. at 6 (citing *Huggins v. FedExGround Package Sys., Inc*., 592 F.3d 853, 860 (8th Cir. 2010)). These factors include:

(a) the extent of control which, by the agreement, the master may exercise over the details of the work;
(b) whether or not the one employed is engaged in a distinct occupation or business;
(c) the kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the employer or by a specialist without supervision;
(d) the skill required in the particular occupation;
(e) whether the employee or the workman supplies the instrumentalities, tools, and the place of work for the person doing the work;
(f) the length of time for which the person is employed;
(g) the method of payment, whether by the time or by the job;
(h) whether or not the work is a part of the regular business of the employer;
(i) whether or not the parties believe they are creating the relation of master and servant; and
(j) whether the principal is or is not in business.

*Id*. (citing Restatement (Second) of Agency § 220 (Am. Law Inst. 1958)); see also *Dean v. Young*, 396 S.W.2d 549, 553-57 (Mo. 1965).

Of these factors, "the touchstone is whether the party sought to be held liable has the control or *right* to control the conduct of another in the performance of an act." J.*M. v. Shell Oil Co*., 922 S.W.2d 759, 764 (Mo. 1996) (citations omitted) (Emphasis added); *Balderas v. Howe*, 891 S.W.2d 871, 873-74 (Mo. Ct. App. 1995). "The determining factor is not whether [the defendant] actually exercised control over the work but whether [the defendant] had the *right* to exercise that control." *Bargfrede v. Am. Income Life Ins. Co*., 21 S.W.3d 157, 162 (Mo. Ct. App. 2000) (quoting *Carter v. Wright*, 949 S.W.2d 157, 160 (Mo. Ct. App. 1997)). The right to control "must extend to the 'means and manner of service' as distinguished from merely controlling the 'ultimate results of the service.'" *Stars Invest. Grp*., 2017 WL 747610, at *6 (quoting *Steele v. Armour & Co.*, 583 F.2d 393, 398 (8th Cir. 1978)); See also *Mendoza*, 2020 WL 6270743 at 4.

3

The master must assert the right to control the physical conduct of the agent/servant while working. Moreover, the employee may be the servant of two masters at one time. *Id* at 4.

Evidence will be presented that Landstar is liable for the negligent acts of APT and Mr. Khayrullaev through agency. Most of the liability evidence against Landstar will be concerning the relationship between Landstar and APT with regard to the GE load that was being carried at the time of the crash and the right of Landstar to control the physical conduct of APT for that load. Plaintiffs believe the evidence shows a great amount of control over APT, creating an agency relationship. At the very least, the issue of agency is a question of fact for the jury. *Gray v. FedEx Ground Package Sys., Inc*., 799 F.3d 995, 999 (8th Cir. 2015).

Plaintiff expects Defendant Landstar to argue that Defendant APT, acting through Defendant Khayrullaev, was not an agent, but rather an independent contractor. An independent contractor is "a person who contracts with another to do something for him, but who is not controlled by the other nor subject to the other's control with respect to his physical conduct in the performance of his undertaking." *Skidmore v. Haggard*, 110 S.W.2d 726, 729-30 (Mo. 1937) (adopting Restatement of Agency's definition of independent contractor). "[S]imply characterizing a party an independent contractor does not make it so. Rather, a court must make a factual determination of independent-contractor status, and whether the parties believe they are creating the relationship of master and servant is only one factor out of many." *Stars Invest. Grp., LLC v. AT&T Corp.*, No. 4:15-CV-01370-AGF, 2017 WL 747610, at *5 (E.D. Mo. Feb. 27, 2017) (internal quotations and citations omitted). Missouri courts routinely consider the factors set forth in § 220(2) of the Restatement (Second) of Agency, shown above, when determining whether a person or entity acting for another is an employee or an independent contractor for

4

purposes of *respondeat* superior liability. *Id*. at 6 (citing *Huggins v. FedExGround Package Sys., Inc*., 592 F.3d 853, 860 (8th Cir. 2010)).

Here, Landstar contends that they were merely a "broker" in this transaction and APT was their independent contractor. Therefore, Landstar argues, no agency relationship existed because there was a contract between Landstar and APT called a "Transportation Brokerage Agreement" that describes the parties as such. However, that position is not supported by Missouri law. In *Riley v. AK Logistics, Inc*., 2017 WL 2501138 (Mo. E.D. 2017), the defendant C.H. Robinson made a similar argument based on a Carrier Services Agreement entered by the parties that specifically stated that it did "not create, nor shall it be deemed to create a partnership, joint venture, or agency relationship between" the parties. Even though there was specific language in the contract stating that no agency relationship existed, this Court still found that an agency relationship could have been created by the amount of control that the "broker" had. That ruling is consistent with Missouri law. *Stars Invest. Grp., LLC v. AT&T Corp.*, No. 4:15-CV-01370-AGF, 2017 WL 747610, at *5 (E.D. Mo. Feb. 27, 2017) (holding that a contract simply characterizing a party as an independent contractor does not make it so. Rather, a court must make a factual determination of independent-contractor status based on other factors, control being the touchstone factor.)

Here, Landstar's Load Confirmation Form [3] gave Landstar control over the physical conduct of APT drivers and APT in that it required: 1) the APT drivers to download the Landstar Connect tracking system; 2) the APT drivers to be in contact with Landstar 24/7 as "check calls" with no exceptions; 3) APT drivers to use a certain type of truck; 4) APT drivers to secure the load

---

[3] Landstar's Load Confirmation Form is incorporated into the APT Brokerage Agreement as a "binding acceptance" under the Brokerage Agreement. (Exhibit G Transportation Brokerage Agreement, p. par. 7 and 13).

5

a certain way; 5) APT drivers to pick up the load at a specific time with financial penalties if they violated pickup time; and 6) APT drivers to wear particular clothing when driving the Landstar load, the failure to wear the required clothing could result in consequential damages, and violation of the requirements of the Load Confirmation Instructions could result in a loss of payment to APT of up to 50%. (Exhibit H, Load Confirmation). The Transportation Brokerage Agreement allowed Landstar to unilaterally offset any payments to APT for claims arising from a shipment and APT was barred from contacting GE, the shipper. (Exhibit G, Transportation Brokerage Agreement, par. 15, 12; Exhibit B, Deposition of Ilimdar Abbasov, p. 47:1-9). These contractual provisions and directions contradict the claim that APT was an independent contractor and support the fact that APT and Khayrullaev were agents/servants of Landstar on this GE load. (Exhibit Q, Report of Thomas Corsi, p. 11-12; Exhibit R, Report of William Hampton, p. 14; Exhibit D, Deposition of William Hampton, p. 100:7-25, p. 101:1-7).

Further, Plaintiff plans on introducing evidence at trial regarding Landstar's influence and control over how much insurance APT would carry. These are more facts to show that APT was an agent of Landstar. Generally, an insurance policy is not admissible to show one's negligence or other wrongful conduct. *Charter v. Chleborad*, 551 F.2d 246, 248 (8th Cir. 1977). "The rule against admission of evidence of insurance, however, does not require the exclusion of evidence of insurance against liability when offered for a purpose other than proof of negligence or other wrongful conduct such as 'proof of agency, ownership, or control…" *Sparks Construction, Inc. v. Hartzell Hardwoods, Inc.*, 2015 WL 7075964 (Mo. App. E.D. 2015) (quoting *Charter*, 551 F.2d at 248) (some internal quotations omitted).

6

For the above reasons, Plaintiff will present facts and evidence to the jury to support their claims of Negligence through Agency theory against Defendants MGI, APT, and Landstar.

### III. Landstar's Negligent Entrustment of Defendant APT and Khayrullaev

An employer is liable for its independent contractor's negligent conduct if the employer fails to exercise reasonable care in hiring a competent independent contractor. *LeBlanc v. Research Belton Hosp.*, 278 S.W.3d 201, 205-06 (Mo. Ct. App. 2008); *Lonero v. Dillick*, 208 S.W.3d 323, 329 (Mo. Ct. App. 2006) (citing S*ullivan v. St. Louis Station Assocs*., 770 S.W.2d 352, 356 (Mo. Ct. App. 1989)). An employer has a duty to hire a "skilled and competent contractor." *Lonero*, 208 S.W.3d at 329 (citing *Sullivan*, 770 S.W.2d at 356). A competent and careful contractor has "the knowledge, skill, experience, and available equipment which a reasonable person would realize that a contractor must have in order to do the work which he or she is employed to do without creating unreasonable risk of injury to others, and who also possesses the personal characteristics which are equally necessary." *Lee v. Pulitzer Pub. Co*., 81 S.W.3d 625, 635 (Mo. Ct. App. 2002) (citing Restatement (Second) of Torts § 411 (1965)). In sum, to make a submissible case for Negligent Hiring of an independent contractor, a plaintiff must prove that the defendant failed to exercise reasonable care in selecting a competent and careful contractor and that the harm caused by the contractor was the type of harm that made the contractor incompetent.

#### A. American Power Transportation and Zukhriddin Khayrullaev were not competent.

Missouri law, as well as the law throughout the United States of America, establishes a duty on behalf of the broker to select a competent and careful carrier to transport a load on the highways of Missouri and the United States. The Restatement (Second) of Torts, § 411 (1965),

7

provides that shippers and brokers are liable "For physical harm to third persons caused by [their] failure to exercise reasonable care to employ a competent and careful contractor (a) to do work which will involve a risk of physical harm unless it is skillfully and carefully done, or (b) to perform any duty which the [company] owes to third persons."

Further, even before Missouri adopted the Restatement (Second) of Torts, § 411, Missouri courts have held an employer liable for negligently hiring and/or selecting an independent contractor. In *Mullich v. Brocker*, 97 S.W. 549 (1905), the Missouri Supreme Court held that a jury was entitled to consider whether an employer had used ordinary care in selecting a 16-year-old boy to break a horse and was therefore liable for the injuries resulting when the boy failed to control the horse, observing that the employer had made but little inquiry into the boy's qualifications before employing him.

In *Baker v. Scott County Milling Co.*, 20 S.W.2d 494 (1929), the court held that the employer had a duty to use ordinary care to employ a person who was reasonably competent and had acquired ordinary skill in doing that kind of work before the employer would be relieved of the duty. The court ruled that the issue of whether an employer had been negligent in failing to exercise reasonable care to select a competent contractor to demolish grain elevators had been properly submitted to the jury.

The Lee court, *supra*, citing the Restatement (Second) of Torts, § 411, held that "a 'competent and careful contractor' denotes a contractor with the knowledge, skill, experience, and available equipment which 'a reasonable person would realize that a contractor must have in order to do the work which he or she is employed to do without creating unreasonable risk of injury to others, and who also possesses the personal characteristics which are equally necessary.'" *Lee,* 81

8

S.W.3d at 635, citing Comment(a). Supporting summary judgment, the *Lee* court held that the plaintiffs produced no evidence that the contractor had a "Poor safety record, a poor reputation, or that he lacked sufficient expertise and experience to act in the capacity as a carrier under the agreement." *Id*. at 635.

As will be demonstrated, Landstar had access to compelling evidence that American Power Transportation was a safety risk. APT's "unsafe driving" BASIC score on March 4, 2015 was 85 and exceeded Landstar's safety threshold and should have disqualified APT pursuant to Landstar's policy. (Exhibit C, Deposition of Thomas Corsi, p. 31:13-20; Exhibit 4, Brokerage Master File, p. 10). APT had only been in business with FMCA operating authority for four days when Landstar hired APT on September 23, 2013. (Exhibit E, Deposition of Scott Ray, p. 67:17-24, p. 68:12-22). APT was an unrated motor carrier. (Exhibit 3, Brokerage Master File, p. 5). In the absence of any DOT safety data, APT could not qualify as an approved third-party motor carrier under Landstar's Uniform Policy for Qualification of Third-Party Motor Carriers. (Exhibit 4, Landstar Uniform Policy for Qualification of Third-Party Motor Carriers, Section 2.1(c) and (c)(i), p. 1-2; Exhibit E, Deposition of Scott Ray, p. 80:9-24, p. 81:1-3). Landstar knew or should have known it had no safety data for APT at the time they hired Landstar and did not get any BASIC safety scores for APT until March of 2015 when they had an "unsafe" driving score of 85, which should have disqualified APT. (Exhibit 3, Brokerage Master File, p. 7; Exhibit 4, Landstar Uniform Policy for Qualification of Third-party Motor Carriers, Section 2.1(c)(i)). Landstar's Brokerage Master File shows additional disqualifying "unsafe driving" scores for APT on October 12, 2016, October 26, 2016, and March 21, 2017. (Exhibit 3, Brokerage Master File, p. 3, 10, 12, 13, 15). But Landstar

never looked at those unqualifying safety scores, nor disqualified APT for unsafe driving. (Exhibit E, Deposition of Scott Ray, p. 107:2-8).

Landstar could have obtained further BASIC scores through APT but did not ask. (Exhibit E, Deposition of Scott Ray, p. 95:1-24). Landstar was required to produce its own BASIC scores to GE under its contract with GE but did not do so. Had Landstar requested the DOT BASIC data it would have demonstrated a carrier with a turbulent history in the categories of unsafe driving, driver fatigue, driver fitness, controlled substance, and vehicle maintenance. (Exhibit 2, Safer Watch Report, p. 1-3). This information, although available, was not requested by Landstar. (Exhibit C, Deposition of Thomas Corsi, p. 44:23-25, p. 45:1-22). The Brokerage Master File indicates that there were several triggering events which, according to Landstar's Vice President of Qualifications, should have caused a review of the file, including insurance lapses and cargo claims. (Exhibit E, Deposition of Scott Ray, p. 106:16-24, p. 107:-2-8). In fact, APT lost their Landstar approval four times from 2013 to 2017 for lack of insurance and cargo claims. (Exhibit 3, Brokerage Master File, p. 3-14). Landstar never looked at the unsafe driving scores, only the insurance. APT's unsafe driving scores should have disqualified APT under Landstar's original Uniform Qualification Policy. (Exhibit C, Deposition of Thomas Corsi, p. 70:1-25). When Landstar amended and raised its threshold ceiling for disqualifications, it was outside industry standards for a reasonable broker. (Exhibit C, Deposition of Thomas Corsi, p. 44:23-25, p. 45:1-22, p. 70:1-25, p. 71:1-25, p. 73:1-25, p. 74:2-17, p. 82:13-23, p. 83, 11-25, p. 84:1-22). Landstar looked the other way on APT's safety records for four years. No reasonable carrier would contract with APT given the safety information or lack thereof.

**IV.     PRE-IMPACT TERROR**

Pre-impact terror experienced by a decedent prior to an impending crash is compensable in a wrongful death action. *Delacroix v. Doncasters, Inc*., 407 S.W.3d 13 (Mo. App. E.D. 2013); *Blum v. Airport Terminal Services, Inc*., 762 S.W.2d 67, 76 (Mo. App. E.D. 1988).

This accident took place when Defendant Khayrullaev lost control of his vehicle while traveling west on Interstate 44. Margaret Carter, deceased, was traveling eastbound on the interstate. Between the westbound lane that Defendant Khayrullaev was occupying, and the eastbound lane where Ms. Carter was driving, was a 38-foot-wide grassy median strip. Within the median strip was a system of cable barriers. There were no temporary or permanently erected structures in the area that would have limited the view of drivers traveling in any direction. It was daylight and the evidence will show that the light conditions and position of the sun should not have been an issue on the day of the accident.

The evidence will show that Ms. Carter saw the oncoming tractor trailer cross the median and enter the eastbound lane. The evidence will also show that Ms. Carter even attempted to avoid the collision by steering to her right. The Plaintiff is entitled to recover damages of the fear and terror that Ms. Carter experienced prior to impact. Even though the only type of pre-death damages RSMo. 537.090 specifically discusses "damages… the deceased may have suffered between the time of injury and the time of death", the Eastern District, and other courts, have accepted that pre-impact terror, or the fear of death before any physical injury or impact was made, is recoverable under Missouri law. *Delacroix v. Doncasters, Inc*., 407 S.W.3d 13 (Mo. App. E.D. 2013); *Blum v. Airport Terminal Services, Inc*., 762 S.W.2d 67, 76 (Mo. App. E.D. 1988).

BRUNTRAGER & BILLINGS, P.C.

BY:  /S/NEIL J. BRUNTRAGER
Neil J. Bruntrager, MO #29688
225 S. Meramec Ave., Suite 1200
Clayton, MO 63105
Tel: (314) 646-0066
Fax: (314) 646-0065
njbatty@aol.com



MONSEES & MAYER, P.C.

BY:  */S/TIMOTHY W. MONSEES*
Timothy W. Monsees, MO #31004
Ryan D. Frazier, MO #69081
4717 Grand Ave, Suite 800
Kansas City, MO 64112
Tel: (816) 361-5555
Fax: (816) 361-5577
rfrazier@monseesmayer.com

**ATTORNEYS FOR PLAINTIFF**

12

## **CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on this 25th day of October, 2022, a true and correct copy of the **Plaintiff's Pre-Trial Brief** was filed electronically with the clerk of the court to be served by operation of the Court's electronic filing system upon all attorneys of record.

/S/ *Neil J. Bruntrager*
Neil J. Bruntrager

**ATTORNEYS FOR PLAINTIFF**